UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TYRONE D. BROCK, JR., | ) | Case No.  3:14CV1075 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | REPORT & RECOMMENDATION OF |
| COMMISSIONER OF | ) | MAGISTRATE JUDGE |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Tyrone D. Brock, Jr. ("Plaintiff"), requests judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and application for Supplemental Security Income ("SSI").  ECF Dkt. #10 ("Tr.") at 85. Plaintiff asserts that the Administrative Law Judge ("ALJ") erred in her decision because she failed to find that Plaintiff's impairments met Listing 1.04(A) and found that Plaintiff has the residual functional capacity ("RFC") to perform light work.  *Id*. at 92-102.  Plaintiff additionally and/or alternatively requests that the Court remand the case based upon new evidence that he submitted after the hearing before the ALJ.  ECF Dkt. #11 at 19.

For the following reasons,  the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

1

## I.       PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on January 21, 2011, alleging disability beginning February 1, 2009.  Tr. at 89.  The Social Security Administration ("SSA") denied Plaintiff's applications initially and upon reconsideration.  *Id.* at 194-96, 205-10.  Plaintiff requested a hearing before and ALJ, which was held on December 5, 2012.  *Id.* 85.

On January 30, 2013, the ALJ issued a decision finding that Plaintiff had not engaged in substantial gainful activity since February 1, 2009 (the alleged onset date), and Plaintiff had severe impairments, thus satisfying the first two steps of the sequential analysis.  Tr. at 91.  The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that satisfied the terms of Listing 1.04 for Disorders of the Spine.  Tr. at 92.  The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with certain exceptions. *Id.* at 94.  The ALJ determined that Plaintiff was unable to perform any past relevant work, but, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform.  *Id.* at 102-03.  Based on the above findings, the ALJ determined that Plaintiff was not disabled under §§ 216(i) and 223(d) of the Social Security Act.

Plaintiff appealed the ALJ's decision to the Appeals Council, and the Appeals Council denied his request for review.  Tr. at 5.  The ALJ's decision therefore became the final decision of the Commissioner.

Plaintiff appealed the decision to this Court on May 19, 2014.  ECF Dkt. #1.  Plaintiff, through counsel, filed his brief on the merits on August 15, 2014.  ECF Dkt. #11.  Defendant filed a brief on the merits on October 29, 2014.  ECF Dkt. #14.  Plaintiff filed a reply brief on November 11, 2014.

ECF Dkt. #15.

## II.     SUMMARY OF MEDICAL EVIDENCE

On January 31, 2009, Plaintiff was involved in a car accident and was transported to University of Toledo Medical Center ("UTMC") where he was diagnosed with a lumbar strain, abdominal pain, and leg pain.  Tr. at 480-90.  On February 5, 2009, Plaintiff returned to UTMC complaining of lower back pain.  *Id.* at 475-79.  During the February 5, 2009 UTMC visit, the attending physician noted straightening of the lumbar spine and a transitional S1 and rudimentary disc at S1-S2.  Tr. at 479.

On March 3, 2009, Plaintiff was admitted to UTMC with complaints of ongoing back pain. Tr. at 457-74.  Dr. Ashok Biyani, M.D., opined that a magnetic resonance imaging ("MRI") of Plaintiff's lower back revealed L4-L5 disc herniation of the extrusion type with an extruded fragment that had migrated superiorly to the right of midline with an associated broad-based disc bulge that was paramidline to the left and caused moderate left neural foraminal encroachment and mild neural foraminal encroachment on the right.  *Id.*  There was also evidence of a snodylitic disc bulge at L5-S1 with bilateral mild to moderate neural foraminal encroachment.  *Id.*  Plaintiff was discharged on March 6, 2009.  *Id.*

On March 10, 2009, Plaintiff returned to UTMC and was seen by Dr. Biyani.  Tr. at 454-56. Plaintiff continued to complain of numbness in his right L3-L4 dermatomes, and was using crutches to ambulate due to mild quadricep weakness.  *Id.*  Plaintiff reported that he was sixty percent improved regarding his pain.  *Id.*  On March 13, 2009, Plaintiff was assessed by Dr. Joseph N. Atallah, M.D., as having a herniated disc and lumbar pain through radiculitis.  *Id.* at 452-54.  On March 25, 2009, Plaintiff returned to UTMC and reported pain in his right lower leg and back pain that was causing muscle spasms.  *Id.* at 450-51.  At an appointment for surgical screening on April

-3-

14, 2009, Plaintiff reported numbness and weakness in his right lower extremity.  *Id.* at 448-49.

On April 17, 2009, Plaintiff underwent microdiskectomy surgical repair of his right herniated intervertebral L3-L4 disc.  Tr. at 446-47.  Dr. Biyani's report detailing the surgery indicated that Plaintiff was awoken following the procedure, and taken to the recovery unit in stable condition.  *Id.* Plaintiff was discharged the following day, April 18, 2009.  *Id.* at 434-36.  On May 5, 2009, Plaintiff returned to UTMC complaining of pain in his right leg, although Plaintiff indicated that he was feeling better despite some residual symptoms.  *Id.* at 431-32.  During Plaintiff's June 9, 2009 follow-up examination, Dr. Biyani indicated that Plaintiff was "doing well."  *Id*. at 430.

On December 22, 2009, Plaintiff returned to UTMC for a second post-surgical follow-up examination.  Tr. at 428-29.  Plaintiff reported that he continued to experience numbness in the anteromedial aspect of his right tibia and into the dorsum of the foot, and was experiencing more back pain as time had passed since the surgery, as well as left lower extremity radicular symptoms.  *Id.*  Dr. Biyani diagnosed post-L3-L4 microdiskectomy with continued back pain, and ordered a MRI and follow-up appointments after the MRI had been performed.  *Id.*  On January 12, 2010, a MRI revealed no evidence of recurrent disc herniation, moderate narrowing of the spinal canal, or neural foramina bilaterally at L3-L4 and L4-L5 due to broad-based midline, paramidline, and bilateral foraminal disc protrusions.  *Id.* at 426-27.  Plaintiff was referred for further treatment and pain management with epidural injections.  *Id.*  at 424-25.

On January 21, 2010, Plaintiff was examined by Dr. Amish Patel, M.D., who noted left, greater than right, lower limb pain, and opined that the pain was most likely symptomatology of radicular pain syndrome, secondary to lumbar spinal stenosis and secondary to central disc protrusion at L3-L4 and L4-L5, causing moderate-to-severe central stenosis.  Tr. at 421-23.  Dr. Patel also noted lumbosacral pain that resonated in the posterior gluteal area, which was most

-4-

likely symptomatology of lumbar diskogenic pain syndrome with somatic referral accounting for the posterior gluteal discomfort.  *Id.*  Dr. Patel recommended oral steroid treatment, and, in the event that the oral steroid treatment failed, bilateral epidural steroid injections, and possibly a decompressive laminectomy with interbody fusion at L3-L4 and L4-L5.  *Id.*

On March 9, 2010 and March 16, 2010, Plaintiff underwent additional epidural pain block treatments.  Tr. at 416-22.  Plaintiff was ordered to use lumbosacral orthosis and a weight belt for anaerobic activity on April 1, 2010.  *Id.* at 413-15.  On June 3, 2010, Plaintiff returned to UTMC complaining of lower limb pain.  *Id.* at 410-12.  The examining physician found that Plaintiff's left, greater than right, lower limb pain was most likely symptomatology of S1 radicular pain syndrome secondary to lumbar spinal stenosis and secondary to central disc protrusion seen at L3-L4 and L4-L5, causing moderate-to-severe central stenosis.  *Id.*  The examining physician also found that Plaintiff's lumbrosacral pain that resonated in the posterior gluteal area was most likely syptomatology of lumbar diskogenic pain syndrome with somatic referral accounting for the posterior gluteal discomfort. *Id.*  On July 15, 2010, Plaintiff reported that his posterior gluteal and lateral thigh and calf pain, which was exacerbated by standing and walking, had improved by greater than eighty percent.  *Id.* at 404-06.  Plaintiff further reported a seventy-five percent reduction in his lower back pain, with use of a  lumbar brace.  *Id.*  On August 16, 2010 and September 3, 2010, Plaintiff received therapeutic selective nerve root blocks for his congenital lumbar stenosis and bilateral S1 radiculitis.  Tr. at 392-95.

On September 9, 2010, Plaintiff was evaluated at UTMC for complaints of wrist pain resulting from an injury sustained while, according to Plaintiff, grabbing a bicycle wheel about two weeks prior to this examination.  Tr. at 389-92.

Plaintiff, complaining of lower back pain, bilateral lower limb pain, and increased left leg weakness while walking, was examined at UTMC on September 28, 2010.  Tr. at 386-88.  Dr. Patel made the same findings as those made during the January 21, 2010 and June 3, 2010 examinations.  *Id.*

On October 1, 2010, Plaintiff underwent a nerve conduction test that revealed findings that were not consistent with acute left S1 radiculopathy.  Tr. at 384-85.  Plaintiff was referred to a physical therapy program with lumbar traction and home exercise to strengthen his L5 and S1 myotomal muscles.  *Id.*

On October 18, 2010, Plaintiff complained of blurry vision, and volumetric multi-detector CT images were obtained of the brain from Plaintiff's skull-base to the vertex without administration of contrast.  Tr. 373-82.  The physician assistant conducting the examination noted the stable appearance of the left craniotomy and associated encephalomalacia, and found no acute intracranial abnormality.  *Id.*

At the request of Dr. Fred Ho-A-Lim, M.D., Plaintiff was reevaluated on December 2, 2010 by Dr. Patel.  Tr. 372-74.  Dr. Patel made the same determination regarding Plaintiff's condition as found at the January 21, 2010, June 3, 2010, and September 28, 2010 examinations.  *Id.*  Dr. Patel recommended that Plaintiff continue to use lumbrosacral orthosis and a weight belt for anaerobic activity, as well as pain management medications and steroid injections because Plaintiff appeared to respond well to these methods.  *Id.*

On December 14, 2010, Dr. Mustafa H. Khan, M.D., noted that there was no tenderness over Plaintiff's lumbosacral spine, and that there was mild pain to palpation paraspinally in Plaintiff's lower lumbar region.  Tr. at 370-71.  Additionally, Dr. Khan noted that a straight leg

test was positive.  *Id.*  Strength on Plaintiff's left side was 5/5 throughout; strength on Plaintiff's right side was approximately 4/5, with L3-L4 motor maneuvers.  *Id.*  Sensation was decreased in the right lower extremity distal to the lower aspects of the knee, all the way to the foot, mostly in the lateral aspect.  *Id.*  Dr. Khan indicated that Plaintiff was experiencing congenital spinal stenosis.  *Id.*  Plaintiff was ordered to undergo a MRI.  *Id.*

On March 10, 2011, Plaintiff underwent a MRI.  Tr. at 531-32.  Dr. Khan found that the sagittal T1 and T2 images demonstrated no abnormalities at the conus medullaris.  *Id.*  There was no significant spinal canal stenosis or neural foraminal narrowing seen at L1-L2, but facet arthropathy was noted.  *Id.*  At the L2-L3 level, there was facet joint degenerative changes noted with ligamentum flavum hypertrophy and mild left-sided neural foraminal narrowing.  *Id.*  At the L4-L5 level, there was a midline and right paramidline disc herniation seen along with facet arthropathy and ligamentum flavum hypertrophy, causing severe spinal canal stenosis, severe right-sided neural foraminal narrowing, and moderate left-sided neural foraminal narrowing.  *Id.*  At the L5-S1 level, there was a large midline and left paramidline disc herniation that was causing moderate spinal canal stenosis, severe left-sided neural foraminal narrowing, and moderate right-sided neural foraminal narrowing.  *Id.*  There was a slight mass effect in the left lateral recess, and facet arthropathy was also noted.  *Id.*  Also on March 10, 2011, Dr. Khan recommended that Plaintiff undergo a two-level fusion with laminectomy and decompression.  Tr. at 535-37.

On March 26, 2011, Dr. Khan evaluated Plaintiff for a surgical consultation at UTMC Department of Orthopedics.  Tr. at 538-39.  During the evaluation, Dr. Khan noted positive straight leg raises on the left and negative on the right.  *Id.*  Dr. Khan concurred in the assessment of Dr. Ho-A-Lim, and recommended surgical fusion of L3-L5 with iliac bone graft harvest.  *Id.*

On May 26, 2011, during a consultation with Dr. Khan, Plaintiff stated that his back and leg symptoms continued to bother him.  Tr. at 540-41.  At the consultation, Plaintiff indicated that he was feeling slightly better, but that the pain was persistent and he still wished to have the surgery performed.  *Id.*

On July 22, 2011, Plaintiff underwent a three level decompression laminectomy at the L3, L4, and L5 levels with decompression of the bilateral L3, L4, and L5 nerve roots, a two level interbody fusion with cage at the L3-L4 and L4-L5 levels, a two level posterolateral intertransverse fusion at the L3-L4 level and L4-L5 level, a two level segmental intrumentation with pedicle screws at L3-L5, and a right sided iliac bone graft harvest.  Tr. at 698-701.  Following the surgery, Dr. Khan noted that Plaintiff was walking upright with good balance, and placed typical post-surgery restrictions on Plaintiff.  *Id.* at 645-46.

At the seven-week follow-up appointment on September 15, 2011, Dr. Khan indicated that x-ray images of Plaintiff's lumbar spine revealed good placement of the hardware and adequate healing of the posterolateral fusion graft.  Tr. at 641-42.  Dr. Khan also indicated that he was pleased with Plaintiff's progress and referred Plaintiff for physical therapy.  *Id.*  On October 31, 2011, Dr. Khan noted that Plaintiff was doing well overall and that Plaintiff's main radicular complaints had resolved.  *Id.* at 761-62.

On February 21, 2012, nerve conduction studies were performed on Plaintiff's right lower extremity.  Tr. at 757-58.  Based on the examination, Dr. Christian Wuescher, M.D., concluded that there seemed to be consistent chronic irritation of the L5 nerve root.  *Id.*  No spontaneous activity was noted at the examination, and there was no evidence of peripheral neuropathy or plexopathy.  *Id.*  On May 8, 2012, Dr. Wuescher reported that Plaintiff was suffering from lower

-8-

back pain with radiation of pain into his right anterior knee with numbness and tingling into his lower left foot. *Id.* at 742-46.  On June 19, 2012, Dr. Wuescher opined that Plaintiff continued to suffer from chronic back pain and radiation into his right leg. *Id.* at 737-41.  Upon physical examination, Dr. Wuescher noted that Plaintiff's squatting was abnormal, there was lumbar spine tenderness, and the range of motion of the lumbar spine was abnormal. *Id.*  Further, Dr. Wuescher also noted a positive right Patrick's test and decreased deep tendon reflexes. *Id.*

Several physicians have provided written medical opinions regarding Plaintiff's impairments for determination of Plaintiff's eligibility for DIB and SSI.  On July 25, 2011, Dr. Ho-A-Lim was provided a medical questionnaire, which he completed at the request of the SSA. Tr. at 636-37.  Dr. Ho-A-Lim opined that Plaintiff had an unsteady gait and would require an ambulatory aid to steady his balance. *Id.*  Additionally, Dr. Ho-A-Lim indicated that Plaintiff had no obvious defects in his ability to perform fine and gross manipulations. *Id.*

On October 16, 2012, Dr. William Padamadan, an independent consultive physician, evaluated Plaintiff at the request of the SSA.  Tr. at 714-16.  At the evaluation, Plaintiff rated his back pain as 9/10 and stated that the pain is increased by prolonged standing and walking, and relieved by taking medications like Tramadol. *Id.*  Plaintiff also stated that the pain is located not only in his back, but also in both hips and the buttocks area, with some shooting, shock-like pains from the right hip to the right foot, periodically. *Id.*  Dr. Padamadam found that Plaintiff's range of motion for the forward bend was limited, apparently due to pain. *Id.*  Plaintiff's straight leg raise was positive in supine position and somewhat limited in sitting position. *Id.*  Dr. Padamadam's summary of Plaintiff's functional status indicated that Plaintiff's hearing, speech, and sight were within normal limits. *Id.*  Plaintiff's communication skills were normal. *Id.*  Upper

-9-

extremity functions for reaching, handling, and fine and gross manipulations were intact.  *Id.*  Dr. Padamadam indicated that Plaintiff will have difficulty with climbing poles and ladders, crawling and kneeling, and frequent bending and stooping.  *Id.*  Based upon the clinical evaluation, Dr. Padamadam indicated that Plaintiff should be able to perform light duty and sedentary activities while standing for at least two hours in an eight-hour work period.  Dr. Padamadam noted that Plaintiff will have difficulty picking up objects from floor level, and that walking and carrying small boxes of five to ten pounds would be acceptable.  *Id.*

Dr. Padamadam also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) report ("Work-Related Activities Report").  Tr. at 721-26.  Dr. Padamadam indicated that Plaintiff could occasionally lift boxes up to ten pounds, but never lift boxes of any greater weight, and that Plaintiff could frequently carry boxes up to ten pounds, occasionally carry boxes from eleven to twenty pounds, and never carry boxes over twenty pounds.  *Id.*  The Work-Related Activities Report stated that Plaintiff could sit for eight hours at one time without interruption, and stand and walk for two hours without interruption.  *Id.*  In an eight-hour workday, Plaintiff could sit for a total of eight hours, stand for a total of six hours, and walk for a total of four hours.  *Id.*  Dr. Padamadam also examined Plaintiff's right hand, his dominant hand, and found that Plaintiff was continuously capable of the activities of handling, fingering, and feeling.  *Id.*  Plaintiff was occasionally capable of the activities of reaching (all types) and pushing/pulling.  *Id.*  The Work-Related Activities Report indicated that Plaintiff could occasionally perform activities requiring the operation of foot controls.  *Id.*  Plaintiff was found to never be capable of climbing stairs, ramps, ladders, or scaffolds, or balancing, stooping, kneeling, crouching, or crawling.  *Id.*  Dr. Padamadam found that Plaintiff could never be exposed to

-10-

unprotected heights, or moving or mechanical parts. *Id.* Plaintiff could occasionally operate a motor vehicle. *Id.* Plaintiff could frequently be exposed to extreme cold or heat, and vibrations. *Id.* Plaintiff could continuously be exposed to humidity and wetness, dust, odors, fumes, and pulmonary irritants. *Id.* Finally, the Work-Related Activities Report indicated that Plaintiff could perform activities like shopping, traveling without a companion, ambulating without using a wheelchair, walking with two canes or two crutches, walking a block at a reasonable pace over rough or uneven surfaces, using standard public transportation, climbing a few steps at a reasonable pace with the use of a handrail, preparing simple meals, caring for his personal hygiene, and sorting, handling, and using paper files. *Id.*

On March 24, 2011, Dr. Gary Hinzman, M.D., reviewed the records for the State agency disability determination pursuant to the Social Security Act. Tr. at 142-59. Dr. Anton Freihofner, M.D., also acting as a reviewing physician, reviewed the claim again on October 28, 2011. *Id.* at 160-93. Both Dr. Hinzman and Dr. Freihofner opined that Plaintiff retained the capacity to occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand or walk in an eight-hour workday. *Id.* at 142-59, 160-93. Further, both reviewing physicians found that Plaintiff had no limitation on pushing or pulling, other than the aforementioned lifting and carrying limitations, and that Plaintiff could frequently climb ramps or stairs, but could never climb ladders, ropes, or scaffolds. *Id.* Both reviewing physicians determined that Plaintiff had no limitations on balance, could frequently stoop, kneel, and crouch, and could occasionally crawl. *Id.* Both Dr. Hinzman and Dr. Freihofner opined that Plaintiff should avoid all workplace hazards. *Id.* Neither reviewing physician found that Plaintiff had an impairment that met a Listing. *Id.*

-11-

### III.    SUMMARY OF TESTIMONY

On December 5, 2012, the ALJ held a hearing at which Plaintiff, represented by counsel, and a vocational expert ("VE") testified.  Tr. at 110.  At the onset of the hearing, the ALJ indicated that she would hold the record open for two weeks following the hearing to allow Plaintiff to submit updated records.  *Id.* at 113.  The ALJ also stated that Plaintiff could request an extension. *Id.*  Plaintiff's counsel made an opening statement briefly stating that Plaintiff's injury was the result of a car accident and stating that Plaintiff continues to experience pain despite surgery. *Id.* at 115.

Plaintiff indicated that he was born on March 29, 1974, divorced, and had five children who did not live with him.  Tr. at 116.  When questioned about his living situation, Plaintiff stated that he was previously living at a residence, but had recently moved in with his sister because he was evicted.  *Id.*  Plaintiff stated that his sister's house is more than one story, and that he had difficulty traveling between the stories and had to use the rail for balance when using the stairs. *Id.*  at 117.

Plaintiff indicated that he had a driver's license and picked his sons up from school about four times a week.  Tr. at 117.  According to Plaintiff, driving to the school takes about five minutes.  *Id.* at 118.  Plaintiff stated that if he drove for a long time, around twenty minutes, that his foot begins to hurt and he must stretch.  *Id.*

Responding to questions posed by the ALJ, Plaintiff indicated that he had a GED and had completed a couple years of college courses.  Tr. at 119.  Plaintiff stated that he ended his employment at a national drug store chain sometime around 1996 to 1998, although he later stated he "was terminated in '07" (it is unclear from the Transcript of the hearing, but it appears from the

-12-

entirety of the record that Plaintiff spoke incorrectly when answering the previous question, indicating that he left this job in 1996 or 1997), and that he had been assisting with part-time flooring projects until the car accident in 2009.  *Id.* at 119-20.  Plaintiff indicated that during his employment he lifted boxes weighing approximately thirty-five pounds, and sometimes unloaded boxes that were heavier.  *Id.*  While employed, Plaintiff stated that he spent most of his time standing up and moving around.  *Id.* at 120.  Plaintiff indicated that from 2000 to 2001 he worked at a call center assisting individuals with computer problems.  Tr. at 120.

When asked why he believed that he could not work, Plaintiff responded by stating that the screws in his back were uncomfortable and distracting, he could not bend over, and that he experienced nerve pain throughout his body, problems with his balance, numbness in his right leg, and sharp pains in his right leg.  Tr. at 121-23.  Plaintiff further indicated that he could sit comfortably for only twenty minutes before experiencing shooting pains from his knee to hip.  *Id.* at 123.  Plaintiff also stated that he could only stand for about twenty minutes before experiencing pain in his hip.  *Id.* at 124.  Plaintiff explained that he could walk for five to ten minutes before feeling jolts in his kneecap area.  *Id.* at 125.

When asked by the ALJ which doctors he saw on a regular basis, Plaintiff replied that he saw a doctor at UTMC on a regular basis, but does not have a family doctor because he did not have insurance until November (presumably, Plaintiff was referring to November 2012, the November prior to the hearing).  Tr. at 125.  Plaintiff also stated that he experienced some side effects from his medications, including drowsiness.  *Id.*  at 126.  When the ALJ asked what mental symptoms Plaintiff experienced that would interfere with working, Plaintiff stated that he felt much older than his actual age, and that he had short-term memory problems.  *Id.* at 127-29.  Plaintiff also indicated that he had difficulties spending time with friends due to physical restraints resulting from his injury.  *Id.* at 129.  Plaintiff complained that the surgery and his medications

affected his sleeping habits and that he had trouble falling asleep.  *Id.* at 130-32.  Plaintiff stated that he could dress himself.  *Id.* at 131.  Plaintiff also indicated that he did not participate in many activities outside of the house due to his injury, and that he received help from his sister, and occasionally his father, when grocery shopping.  *Id.*  at 133-34.

The ALJ then questioned the VE regarding hypothetical employment for Plaintiff.  *Id.* at 137.  For the first question, the ALJ asked that the VE assume a hypothetical individual, vocationally situated as Plaintiff, that could perform all functions of light work except they are limited to occasional stairs and ramps, no ladders, ropes, or scaffolds, frequent balancing, occasional stooping, kneeling, crouching, and crawling.  *Id.*  The ALJ further instructed that there should be no exposure to hazards such as unprotected heights, and there should be no requirement of commercial driving.  *Id.* at 138. The hypothetical individual is limited to unskilled work at an SVP level of one or two, and a static work environment with no work where the pace of productivity is dictated by an external source over which the hypothetical individual has no control.  *Id.*  There should be no contact with the general public, occasional contact with co-workers with no tandem work assignments, and occasional contact with supervisors.  *Id.*

When asked whether such a person as posed in the above hypothetical could perform Plaintiff's relevant work either as actually performed or as generally performed in the economy, the VE answered that, based on the hypothetical, the employee could not perform any jobs Plaintiff had performed in the past.  Tr. at 138.  The VE indicated that there were a number of jobs that exist in the state and national economy that could be performed, such as shipping and receiving clerk, stock clerk, and office support worker.  *Id.* at 138-39.

The ALJ then posed a second hypothetical assuming the same limitations as in the first hypothetical, but in addition the hypothetical individual can only operate occasional foot controls with the bilateral lower extremities, and the work should be able to be done in either a seated or

-14-

standing position with standing limited to two hours at a time.  Tr. at 139.  The VE indicated that

these additional characteristics would not have any impact on the ability to perform the jobs

previously identified in response to the first hypothetical.  *Id.*

The VE then discussed ordinary work breaks in the above referenced positions, and stated

that all the positions were unskilled employment.  Tr. at 139.  Finally, the VE stated that the

discussed positions would allow the employee to be off task twenty percent of the time and still

maintain his position.  *Id.* at 140.  Following the testimony of the VE, the ALJ concluded the

hearing.  *Id.* at 140-41.

## IV.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to

DIB and SSI.  These steps are:

> 1.    An individual who is working and engaging in substantial gainful activity
>       will not be found to be "disabled" regardless of medical findings (§§20
>       C.F.R.  404.1520(b) and 416.920(b) (1992));
>
> 2.    An individual who does not have a "severe impairment" will not be found to
>       be "disabled" (§§20 C.F.R.  404.1520(c) and 416.920(c) (1992));
>
> 3.    If an individual is not working and is suffering from a severe impairment
>       which meets the duration requirement, see §§20 C.F.R. 404.1509 and
>       416.909 (1992), and which meets or is equivalent to a listed impairment in
>       20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made
>       without consideration of vocational factors (§§20 C.F.R.  404.1520(d) and
>       416.920(d) (1992));
>
> 4.    If an individual is capable of performing the kind of work he or she has
>       done in the past, a finding of "not disabled" must be made (§§20 C.F.R.
>       404.1520(e) and 416.920(e) (1992));
>
> 5.    If an individual's impairment is so severe as to preclude the performance of
>       the kind of work he or she has done in the past, other factors including age,
>       education, past work experience and residual functional capacity must be
>       considered to determine if other work can be performed (§§20 C.F.R.
>       404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).   The claimant has the burden of going

forward  with the evidence at the first four steps and the Commissioner has the burden at Step Five

to show that alternate jobs in the economy are available to the claimant, considering his or her age,

education, past work experience and RFC.  *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir.

1990).

## V.      STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited in scope by § 205 of the Social

Security Act, which states that the "findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this

Court is limited to determining whether substantial evidence supports the findings of the

Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v.*

*Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even

if substantial evidence exists in the record that would have supported an opposite conclusion, so

long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.*, 127

F.3d 525, 528 (6th Cir. 1997).   Substantial evidence is more than a scintilla of evidence, but less

than a preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   It is evidence that a

reasonable mind would accept as adequate to support the challenged conclusion.  *Id.*; *Walters,* 127

F.3d at 532.  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health*

*& Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.     ANALYSIS

### A.      LISTING 1.04(A)

Plaintiff first asserts that the ALJ erred at Step Three of the sequential analysis when she

determined that Plaintiff does not have an impairment or combination of impairments that meets or

is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App.1.  Tr. at 92-94.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes

impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity.  20 C.F.R. § 416.920.  In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that his or her impairments meet or are medically equivalent to a listed impairment.  *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987).  In order to meet a listed impairment, the claimant must show that his or her impairments meet all of the requirements for a listed impairment.  *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987).  An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Listing 1.04(A) provides:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

Listing 1.04(A).

Plaintiff asserts that the medical evidence presented demonstrates that he suffers from compression of a nerve root.  ECF Dkt. # 11 at 11.  Plaintiff also claims that medical evidence proves that he suffers from lower back pain, a decrease in the lumbar range of motion, motor loss and sensory/reflex loss, and that he had positive straight leg raise tests.  *Id.* at 12-13.  Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff did not meet any listings, including Listing 1.04(A).  ECF Dkt. #14 at 10.

In making a determination as to whether Plaintiff met Listing 1.04(A), the ALJ stated:

> The limitations of [Plaintiff] do not satisfy the terms of Listing 1.04 for Disorders of the Spine.  The claimant does not have a condition that results in the compromise of a nerve root with evidence of nerve root compression, spinal arachnoiditis, or lumber spinal stenosis resulting in pseudoclaudication established by findings on appropriate medically acceptable imaging and manifested by chronic pain and weakness.

Tr. at 92.  Standing alone, it is questionable as to whether this analysis suffices to support a finding that Plaintiff's impairments did not meet Listing 1.04(A).  However, the Court may look at the rest of the ALJ's decision in order to determine whether substantial evidence supports the ALJ's Step Three determination.  *See Smith-Johnson v. Comm'r of Soc. Sec.*, 2014 WL 4400999, at *8 (it was proper for the court to look at other steps of ALJ's decision to determine Step Three analysis), citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) and *Snoke v. Astrue,* No. 2:10CV1178, 2012 WL 568986 (S.D. Ohio, Feb. 22, 2012), unpublished ("[r]ather, a court must read the ALJ's step-three analysis in the context of the entire administrative decision and may use other portions of a decision to justify the ALJ's step-three analysis.").

Here, the ALJ provided extensive detail when discussing the medical evidence concerning Plaintiff's conditions and medical history.  The ALJ considered multiple listings to determine whether Plaintiff met the requirements by compiling information contained in the Transcript to provide a basis for the analysis.  For instance, in addition to the above cited passage regarding Listing 1.04(A), the ALJ considered Plaintiff's mental impairments, restrictions in activities of daily living, difficulties in social functioning, difficulties in concentration, and any episodes of decompensation.  Tr. at 92-93.  Additionally, the ALJ provided an extensive analysis of Plaintiff's condition relating to his RFC (discussed below).  *Id.* at 94-101.

The ALJ expressly referred to Listing 1.04(A) in her analysis, and stated that she considered Plaintiff's impairments and found that the impairments did not meet or medically equal

Listing 1.04(A).  The ALJ is not under a heightened articulation requirement at Step Three of the sequential analysis.  *See Bledsoe,* 165 Fed. App'x 408 (finding that the ALJ did not err by not spelling out every consideration in the Step Three analysis).  The ALJ's specific enumeration of Plaintiff's failure to meet the requirements of Listing 1.04(A) coupled with the entirety of the ALJ's analysis available from the record indicate that there was sufficient evidence to support the ALJ's finding.

The undersigned notes that the scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards and whether substantial evidence supports the findings of the Commissioner.  *Abbott,* 905 F.2d at 922.  Moreover, this Court cannot reverse the ALJ's decision if it is supported by substantial evidence, even if substantial evidence exists that would have supported an opposite conclusion.  *Walters*, 127 F.3d at 528.  Plaintiff claims that the ALJ's conclusion is contrary to the extensive medical evidence in this claim.  ECF Dkt. #11 at 14.

The ALJ devoted a substantial portion of her written decision to discussing Plaintiff's medical history and progress regarding his injury.  Tr. at 92-102.  Although the majority of the discussion occurs in the section of the written decision regarding Plaintiff's RFC, this Court may look to the record as a whole when making an inquiry into the ALJ's Step Three analysis.  The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible.  *Id.* at 102.

The ALJ provided a thorough recitation of Plaintiff's medical history in her written decision. The ALJ considered imaging studies and examination reports before reaching her Step Three determination.  For example, in March and April 2009, Plaintiff underwent various treatments, including a microdiskectomy surgical repair of his right herniated invertebral disc, and

by July 2010, Plaintiff reported an eighty percent improvement in posterior gluteal and lateral thigh and calf pain, with exacerbation occurring only when standing and walking.  Tr. at 97.  The ALJ also noted that despite continued reports of pain through early September 2010, Plaintiff was evaluated at UTMC for a wrist injury sustained on a bicycle two weeks prior.  *Id.*  On October 1, 2010, Plaintiff underwent a nerve conduction test at UTMC, and the test revealed findings consistent with left S1 radiculopathy and Plaintiff was referred for physical therapy.  *Id.*  Plaintiff did not participate in physical therapy.  *Id.*

The ALJ indicated that in January 2011, Plaintiff underwent a MRI and was assessed with central disk herniation at L4-L5, causing moderate central canal stenosis and severe central stenosis at L3-L4, with a laminectomy defect on the right side with central disc protrusion visible. Tr. at 98.  On March 10, 2011, Dr. Ho-A-Lim recommended that Plaintiff undergo interbody fusion with laminectomy and decompression.  *Id.*  Plaintiff underwent surgery on July 22, 2011. *Id.*  At the seven-week follow-up examination, it was noted by Dr. Khan that x-ray images of Plaintiff's lumbar spine revealed good placement of the hardware and adequate healing of the posterolateral fusion graft, the examining physician was pleased with Plaintiff's progress, and Plaintiff acknowledged that he was experiencing significant improvements in his symptoms.  *Id.*

The ALJ continued, stating that on October 31, 2011, Plaintiff was evaluated at the thirteen week post-spinal fusion operation mark.  Tr. at 98.  Dr. Ho-A-Lim, noted that Plaintiff was doing well overall and reported that Plaintiff's radicular complaints had resolved.  *Id.*  Although Plaintiff still had some minor complaints, Dr. Ho-A-Lim noted vast improvements in Plaintiff's symptoms. *Id.*

The ALJ noted that on February 21, 2012, Plaintiff underwent a nerve conduction study at UTMC.  *Id.*  The results of the study indicated that Plaintiff had ongoing chronic L5 radiculopathy, however, Dr. Wuescher indicated that there was no evidence of acute findings and that Plaintiff

had not been taking his prescribed medications.  *Id.*  The ALJ continued, noting that an x-ray examination performed at UTMC in February 2012 indicated no acute abnormalities and no significant joint effusion or arthritis.  *Id.*  It was also noted by the ALJ that Dr. Ho-A-Lim's follow-up treatment notes indicated that Plaintiff's residual pain was adequately managed pharmaceutically and outpatient monitoring was ongoing.  *Id.*  at 98-99.  At a follow-up visit with Dr. Wuescher in November 2012, Plaintiff was continued on the medication treatment regime.  *Id.* at 99.

The ALJ also looked to medical records to review Plaintiff's mental impairments.  Tr. at 99.  Plaintiff was evaluated at Harbor Behavioral Health Care ("Harbor") on March 1, 2012, following a self-referral.  *Id.*  Plaintiff reported symptoms of depression, paranoia, feelings of fear around others, and anxiety.  *Id.*  Plaintiff was diagnosed with depressive disorder (not otherwise specified), panic disorder (without agoraphobia), rule-out post-traumatic stress disorder, and assigned a global assessment of functioning (GAF) score of 60.  *Id.*  Treatment notes from the assessment indicate that Plaintiff attended one therapy session in April 2011 and then discontinued services until November 2012.  *Id.*  In November 2012, Plaintiff returned to Harbor after a domestic violence conviction to complete domestic violence and anger management classes.  *Id.* On December 7, 2012, Plaintiff was diagnosed with depressive disorder (not otherwise specified), panic disorder (without agoraphobia), and rule-out post-traumatic stress disorder.  *Id.* Plaintiff was again assigned a GAF score of 60.  *Id.*  GAF ratings of 51-60 reflect moderate difficulty in social, occupational, or school functioning.  *Id.*

The ALJ's written decision evidences the thoroughness of the review.  The Court cannot reverse the ALJ even if substantial evidence exists in the record that would have supported an opposite conclusion, as the Plaintiff contends, so long as substantial evidence supports the ALJ's conclusion.  *See Walters*, 127 F.3d at 528.  The substantiality of the evidence is based upon the

record as a whole. *Houston*, 736 F.2d 365. Substantial evidence is more than a scintilla of evidence, but less than a preponderance, and it is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Richardson*, 402 U.S. at 401; *Walters*, 127 F.3d at 532.

Substantial evidence exists on the records that Plaintiff does not meet Listing 1.04(A). Plaintiff argues that the ALJ's determination was contrary to medical evidence, but fails to demonstrate how the evidence used by the ALJ to support her conclusion was unreasonable or unsubstantial. ECF Dkt. #15 at 2-4. Further, Plaintiff has failed to demonstrate that the amount of evidence cited by the ALJ in her decision does not rise to some level equal to or less than a scintilla of evidence. Plaintiff merely argues that his impairments should lead to a finding of disability, but does not demonstrate how the ALJ's decision was erroneous or not based on substantial evidence. Accordingly, because this Court cannot reverse the decision of the ALJ even if substantial evidence exists in the record that would have supported an opposite conclusion so long as substantial evidence supports the ALJ's conclusion, and substantial evidence supports the ALJ's decision, that decision must be affirmed.

For these reasons, the Court finds that substantial evidence supports the ALJ's decision finding that Plaintiff's impairments did not meet Listing 1.04(A). The ALJ's decision as a whole sufficiently discussed the criteria of Listing 1.04(A) and cited to sufficient evidence in the record. Accordingly, the Court finds that substantial evidence existed to support the ALJ's Step Three finding regarding Listing 1.04(A).

**B.** **RFC**

Plaintiff also challenges the ALJ's RFC determination that Plaintiff was capable of performing light work with some physical limitations. ECF Dkt. #11 at 15. For the following reasons, the Court finds that substantial evidence supports the ALJ's RFC determination.

It is the ALJ who is responsible for determining a claimant's RFC.  20 C.F.R. §

404.1546(c); *Fleisher v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  The RFC is the most

that a claimant can still do despite his or her restrictions.  SSR 96-8p.  It is "an administrative

assessment of the extent to which an individual's medically determinable impairment(s), including

any related symptoms, such as pain, may cause physical or mental limitations or restrictions that

may affect his or her capacity to do work-related physical and mental activities." *Id*.  It is a

claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting

on a regular and continuing basis, and the RFC assessment must include a discussion of the

individual's abilities on that basis." *Id*.  The Ruling defines a "regular and continuing basis" as

eight hours per day, five days per week, or the equivalent thereof. *Id.*

In determining a claimant's RFC, SSR 96-8p instructs that the ALJ must consider all of the

following:  (1) medical history; (2) medical signs and lab findings; (3) the effects of treatment,

such as side effects of medication, frequency of treatment and disruption to a routine; (4) daily

activity reports; (5) lay evidence; (6) recorded observations; (7) statements from medical sources;

(8) effects caused by symptoms, such as pain, from a medically determinable impairment; (9) prior

attempts at work; (10) the need for a structured living environment; and (11) work evaluations.

SSR 96-8p.  The ALJ must provide "a narrative discussion describing how the evidence supports

each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence

(e.g. daily activities, observations)." *Id*.  The ALJ must also thoroughly discuss objective medical

and other evidence of symptoms such as pain and set forth a "logical explanation" of the effects of

the symptoms on the claimant's ability to work. *Id.*

In the instant case, the Court finds that substantial evidence supports the ALJ's

determination of Plaintiff's RFC and that she adequately fulfilled the requirements of SSR 96-8p.

The ALJ reviewed Plaintiff's medical history, lab findings, daily activity reports, recorded

observations, and considered Plaintiff's mental and physical impairments when developing her RFC finding, as indicated by the summary of the ALJ's written decision in the previous sections. Further, the ALJ provided a narrative describing how the evidence supported her conclusion and cited medical and nonmedical evidence.

The ALJ took into account the diagnoses of lumber spine spondylosis and stenosis, and radicular pain syndrome. Tr. at 96-97. The ALJ noted marked improvements in Plaintiffs condition following his April 2009 surgery. *Id.* at 96. The ALJ's written decision indicated that Plaintiff reported an eighty percent improvement in posterial gluteal and lateral thigh and calf pain, with exacerbation occurring only when standing and walking. *Id.* at 97. Additionally, it was noted that Plaintiff reported a seventy-five percent reduction in lower back pain exacerbation, with use of a back brace. *Id.* On October, 1, 2010, a nerve conduction test performed on Plaintiff revealed findings consistent with acute S1 radiculopathy. Tr. #10 at 97. The ALJ indicated that Plaintiff was referred for physical therapy, but did not participate. *Id.*

On March 10, 2011, Dr. Ho-A-Lim recommended that Plaintiff undergo interbody fusion with laminectomy and decompression. Tr. at 98. In July 2011, Plaintiff underwent the surgery. *Id.* Surgical notes from Dr. Khan indicated satisfactory alignment of S4-L1, with good placement of disc spacers and intact hardware. *Id.* The ALJ indicated that during two post-surgical evaluations, conducted in August 2011 and September 2011, respectively, Dr. Khan noted that Plaintiff was walking upright with good balance and that x-ray images revealed good placement of the hardware and adequate healing of the posterolateral fusion graft. *Id.* Additionally, the ALJ noted that Dr. Khan reported that, during the September 2011 post-surgical evaluation, Plaintiff acknowledged that he was experiencing significant improvements in his symptoms. *Id.*

The ALJ indicated in her written decision that after Plaintiff's October 31, 2011 evaluation, Dr. Ho-A-Lim noted that Plaintiff was doing well overall and reported that Plaintiff's radicular

complaints had resolved.  Tr. at 98.  The ALJ also noted that, although some of Plaintiff's minor residual complaints remained, Dr. Ho-A-Lim noted vast improvements in Plaintiff's symptoms. *Id.*  Additionally, the ALJ stated that following a nerve conduction study that occurred on February 21, 2012, Dr. Wuescher indicated that there was no evidence of acute findings and that Plaintiff had not been taking prescribed medications.  *Id.*  The ALJ also noted that Plaintiff underwent an x-ray examination in February 2012 that indicated no acute abnormalities and no significant joint effusion or arthritis in Plaintiff's right knee.  *Id.*

The ALJ indicated that she reviewed Plaintiff's history of mental impairments.  Tr. at 99. As stated above, the ALJ paid notice to the GAF score of 60 assigned by staff from Harbor.  *Id.* The ALJ gave this score great weight, as it was consistent with Plaintiff's concentration, persistence, and pace as evidenced from the treatment records and Plaintiff's activities of daily living.  *Id.*  The ALJ also noted that GAF ratings from 51-60 reflect moderate difficulty in social, occupational, or school functioning.  *Id.*

The ALJ gave great weight to Dr. Ho-A-Lim's medical questionnaire completed at the request of the SSA on February 25, 2011.  Tr. at 99.  In his responses to the questionnaire, Dr. Ho-A-Lim opined that Plaintiff had unsteady gait and would require the use of an ambulatory aid for balance and walking, and that Plaintiff had no obvious defects in his ability to perform fine and/or gross manipulations.  *Id.*  Great weight was given to the opinion of Dr. Ho-A-Lim as it was consistent with his treatment notes and was supported by radiological examinations of Plaintiff's spine, which indicated that Plaintiff does have impairments consistent with limitations in ambulation for extended periods, and these impairments limited Plaintiff to work at a light exertional level that can be done in a seated or standing position or combination thereof.  *Id.*

On October 6, 2011, Dr. Mark D. Hammerly, Ph.D., an independent consultative psychologist, evaluated Plaintiff at the request of the Ohio Bureau of Disability Determination.  Tr.

at 100. The ALJ indicated that following a clinical interview, Dr. Hammerly diagnosed Plaintiff with major depression (single episode, moderate) and assessed a GAF score of 58. *Id.* Dr. Hammerly opined that Plaintiff would have no difficulties in managing his own funds and should be able to understand and apply instructions in an employment setting at a mostly average level. *Id.* The ALJ also noted that in terms of concentration, attention, persistence, and pace, Dr. Hammerly opined that Plaintiff's abilities appeared grossly normal in terms of what could be expected for daily work performance. *Id.* Dr. Hammerly also assessed that Plaintiff's depression would cause some noticeable problems in relating to supervisors and coworkers, despite Plaintiff's lack of arguing, fighting, or other insubordinate behaviors. *Id.* Finally, Dr. Hammerly opined that Plaintiff would be expected to respond to ordinary workplace pressures with a significant decrease in coping ability, efficiency, and adaptive functioning in the face of a changing workplace environment. *Id.*

The ALJ gave great weight to the opinion of Dr. Hammerly as it was consistent with the statements made by Plaintiff at the hearing and found in Plaintiff's function reports, which indicated moderate limitations in social function and activities of daily living. Tr. at 101. The ALJ also gave great weight to the GAF score given by Dr. Hammerly in that it is consistent with treatment notes from Harbor. *Id.*

On October 16, 2012, Dr. Padamadan, M.D., acting as an independent consultive physician, evaluated Plaintiff at the request of the SSA. Tr. at 100. The ALJ noted that, in the opinion of Dr. Padamadan, Plaintiff was capable of: lifting twenty pounds occasionally; lifting ten pounds frequently; sitting eight hours in an eight-hour workday; standing a total of six hours in an eight-hour workday; and walking for a total of four hours in an eight-hour workday. *Id.* The ALJ also indicated that Dr. Padamadan opined that Plaintiff required the use of a cane to ambulate, and could occasionally reach and push/pull within the previously mentioned weight limitations. *Id.*

The ALJ further indicated that  Plaintiff could continuously handle, finger, and feel, and could occasionally use foot controls bilaterally.  *Id.*  Dr. Padamadan also assessed that Plaintiff could never climb ladders, ropes, scaffolds, ramps, stairs, or balance, stoop, kneel, crouch, or crawl.  *Id.* Dr. Padamadan further opined that Plaintiff should never be exposed to the workplace hazards of unprotected heights and moving mechanical parts, however, Plaintiff could occasionally be exposed to the operation of motor vehicles and could frequently tolerate exposure to extreme cold, extreme heat, and vibrations.  *Id.*  The ALJ noted that Dr. Padamadan opined that Plaintiff could tolerate continuous exposure to humidity and wetness, odors, fumes, dust, and very loud noises. *Id.*  Finally, the ALJ indicated that Dr. Padamadan placed no limitations on Plaintiff's activities of daily living.  *Id.*

The ALJ gave great weight to the opinion of Dr. Padamadan in terms of his assessment of Plaintiff's overall exertional limitations and limitation on the use of foot controls, as the assessment is consistent with the opinion of Dr. Wuescher, an independent consultive physician. Tr. at 100.  The ALJ gave little weight to Dr. Padamadan's assessment of a total preclusion of postural limitations because the findings were not supported by the objective medical evidence and radiological reports, which indicate that Plaintiff could still climb ramps, use stairs, balance, stoop, kneel, crouch, and crawl - albeit at reduced levels of functioning.  *Id.*

The ALJ also discussed the opinion of State agency physicians.  Tr. at 101-102.  Dr. Hinzman and Dr. Freihofner reviewed Plaintiff's file for the State agency disability determination component on March 24, 2011 and October 29, 2011, respectively.  *Id.* at 101.  Both Dr. Hinzman and Dr. Freihofner believed that Plaintiff: was capable of occasionally lifting twenty pounds; could frequently lift ten pounds; could sit/stand/walk for six hours in an eight-hour workday; had no limitations on pushing/pulling other than the limitations for lifting/carrying; could frequently climb ramps or stairs; could never climb ladders, ropes, or scaffolds; had no limitations on balance; could

-27-

frequently stoop, kneel, and crouch; could occasionally crawl; and should avoid all workplace hazards.  *Id.*

The ALJ gave partial weight to the opinions of Dr. Hinzman and Dr. Freihofner.  Tr. at 101.  The ALJ indicated that although the opinions of Dr. Hinzman and Dr. Freihofner were consistent with the assessment by Dr. Padamadan, an independent consultive physician, their opinions were not consistent with the medical evidence, which suggested ongoing postural limitations.  *Id.*  The ALJ noted that the opinions of Dr. Hinzman and Dr. Freihofner were consistent with the opinion of Dr. Ho-A-Lim, indicating limitations consistent with limitations on ambulation for extended periods.  *Id.*

On October 27, 2011, Dr. Paul Tangeman, Ph.D., reviewed Plaintiff's file for the State agency disability determination component.  Tr. at 101.  Dr. Tangeman, opined that Plaintiff had moderate limitations in activities of daily living, moderate limitations in social function, and mild limitations in concentration, persistence, and pace.  *Id.*  In his assessment, Dr. Tangeman believed that Plaintiff had no limitations in his ability to: carry out short, simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; maintain regular attendance; sustain an ordinary routine without special supervision; make simple, work-related decisions; and complete a normal workday without interference from psychologically-based symptoms.  *Id.*  Dr. Tangeman opined that Plaintiff should be limited to light, unskilled work.  *Id.*

The ALJ gave great weight to the opinion of Dr. Tangeman as it was consistent with the opinion of Dr. Hammerly and treatment notes from Harbor indicating that Plaintiff has only mild limitations in concentration, persistence, and pace.  Tr. at 102.  Additionally, the ALJ determined that the opinion of Dr. Tangeman was consistent with statements made by Plaintiff at the hearing, which indicated some limitations in social function, adaptation to changes, and completion of activities of daily living.  *Id.*

The ALJ stated that after careful consideration of the evidence, she found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible.  *Id.*  The ALJ further highlighted that although Plaintiff alleged that he was unable to work due to severe back pain, leg pain, and seizures, the objective medical evidence indicated that despite not undertaking post-operative physical therapy, Plaintiff experienced significant reductions in symptoms.  *Id.*  Finally, the ALJ stated that, in sum, her RFC assessment was supported by the objective medical evidence, the opinion evidence, and the statements of Plaintiff, as found in the disability and function reports.  *Id.*

Keeping in mind the standard of review, which is whether substantial evidence supports the ALJ's determination, even if substantial evidence may support the opposite conclusion, the Court finds that substantial evidence supports the ALJ's RFC determination that Plaintiff could perform a modified range of light work.

**C.**      **NEW EVIDENCE**

Plaintiff also requests that the Court remand his case based upon additional evidence that has been submitted to this Court with the Plaintiff's merit brief.  ECF Dkt. #11 at 19.

The new evidence serving as the basis for the request was collected between February 12, 2013 and February 4, 2014.  ECF Dkt. #11 at 17-18.  On February 12, 2013, Dr. John Kane, M.D., opined that Plaintiff suffered from bilateral leg pain and right hip pain with numbness and tingling, a weak and unsteady gait, abnormal lumbar spine range of motion, positive straight leg raise test, and tender paraspinals.  *Id.* at 7-8.  Further, Dr. Kane noted that Plaintiff's exam suggested L5-S1 radiculopathy and diagnosed Plaintiff with back pain with radiation, chronic pain syndrome, lumbar disc syndrome, and chronic knee pain (not controlled).  *Id.* at 8.  On May 14, 2013, an EMG showed that Plaintiff suffered from chronic left L5 radiculopathy and chronic right L5>L4

radiculopathy.  *Id.*  On July 16, 2013, Dr. Sharleen Suico, M.D., opined that Plaintiff continued to

suffer from bilateral leg pain and a "pins and needles sensation" in both feet.  *Id.*  On February 4,

2014, Dr. Wuescher opined that Plaintiff continued to suffer from back pain with radiation, lumbar

spine tenderness, abnormal lumbar spine range of motion, back stiffness, positive straight leg raise

on the right, positive bilateral facet loading test, and back pain that worsened with lumbar flexion.

*Id.*

Plaintiff argues that the proposed new evidence complies with the requirements of 42

U.S.C. § 405(g).  Plaintiff asserts that the above evidence is new as it was not before the ALJ, and

material as it shows the greater severity of Plaintiff's condition along with the continuation and

worsening of Plaintiff's symptoms.  ECF Dkt. #11 at 19.  Plaintiff also asserts good cause for not

submitting the new evidence to the ALJ because the medical records were not available until after

the hearing.  *Id.*

Sentence six of § 405(g) addresses situations where a claimant submits new evidence that

was not presented to the ALJ but that could alter the ALJ's ultimate decision. Sentence six of §

405(g) provides, in relevant part:

> The court ... may at any time order additional evidence to be taken before
> the Commissioner of Social Security, but only upon a showing that there
> is new evidence which is material and that there is good cause for the
> failure to incorporate such evidence into the record in a prior proceeding;
> and the Commissioner of Social Security shall, after the case is remanded,
> and after hearing such additional evidence if so ordered, modify or affirm
> the Commissioner's findings of fact or the Commissioner's decision, or
> both....

42 U.S.C. § 405(g).

A "sentence six" remand is appropriate "only if the evidence is 'new' and 'material' and

'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of

Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  Evidence is "new" if it did not exist at the time of the

administrative proceeding and "material" if there is a reasonable probability that a different result would have been reached if introduced during the original proceeding. *Id*. "Good cause" is demonstrated by "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). "The party seeking a remand bears the burden of showing that these requirements are met." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006).  Courts "are not free to dispense with these statutory requirements." *Id*. at 486.

In a sentence-six remand, the court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*

In order to show good cause,  a claimant is required to detail the obstacles that prevented him or her from entering the evidence in a timely manner.  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 Fed. Appx. 713, 725 (6th Cir. 2012). The Sixth Circuit "takes a harder line on the good cause test with respect to timing and thus requires that the claimant 'give a valid reason for his failure to obtain evidence prior to the hearing.'"  *Id.*, quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).  Here, Plaintiff's only argument as to why the evidence is new is that the evidence was not before the ALJ because the records were not available.  ECF Dkt. #11 at 19.  This argument alone is not necessarily sufficient in the Sixth Circuit to prove that Plaintiff had good cause for failing to present the evidence in compliance with sentence six of § 405(g).  *See Courter*, 497 Fed. Appx. at 725.

Good cause is shown for a sentence-six remand only "if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability." *Payne v. Comm'r of Soc*. Sec., No. 1:09–cv–1159, 2011 WL 811422, at * 12 (W.D.Mich. Feb.11, 2010), unpublished (finding that evidence generated after the hearing and submitted to the Appeals Council for the purpose of attempting to prove disability was not "new").

Plaintiff argues that the records are actually new and material because they show the greater severity of Plaintiff's condition along with the continuation and worsening of Plaintiff's symptoms, however, this argument fails.  Evidence of a deterioration of a condition is not relevant since it "does not demonstrate the point in time that the disability itself began." *Sizemore v. Sec'y of Health and Human. Servs*., 865 F.2d 709, 712 (6th Cir. 1988).  Here, while the after-acquired evidence may show that Plaintiff's condition deteriorated following the ALJ's decision, the evidence fails to show that the date upon which Plaintiff's impairment actually became disabling had occurred during the relevant time period at issue in this case.  Plaintiff alleges a disability onset date of February 1, 2009 in applications for DIB and SSI filed on January 21, 2011.  Tr. at 89. Plaintiff does not argue, nor is it demonstrated from the record, how any of the new evidence submitted demonstrates that Plaintiff's impairment became disabling during the alleged disability onset date.  Plaintiff's new evidence is not material because there is not a reasonable probability that a different result would have been reached if the evidence was introduced during the original proceeding.

Plaintiff has not shown good cause for the failure to incorporate the proposed evidence into the record in a prior proceeding because the only reason for this failure offered by Plaintiff is that the evidence was not in existence at the time of the hearing.  This reason does not satisfy the good cause requirement.  Plaintiff does not attempt to give a valid reason for his failure to obtain the

evidence prior to the hearing.  Plaintiff's argument that the evidence is material is also flawed because the proposed new evidence does not demonstrate that Plaintiff actually became disabled during the alleged period of the disability onset.  Therefore, Plaintiff has not met his burden of showing that a remand is required because new, material evidence has been submitted.

## VII.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.


Dated: May 28, 2015                                   */s/ George J. Limbert*_____
                                                      GEORGE J. LIMBERT
                                                      UNITED STATES MAGISTRATE JUDGE



ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).